**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EXTENET SYSTEMS, INC.,<br><br>                              Plaintiff,<br><br>vs.<br><br>THE TOWN OF HULL and THE TOWN OF HULL BOARD OF SELECTMEN, and DOMENICO SESTITO, GREG GREY, JOHN D. REILLY, KEVIN RICHARDSON, and JENNIFER BERARDI-CONSTABLE, in their capacities as members of the TOWN OF HULL BOARD OF SELECTMEN<br><br>                              Defendants. | Civil Action No. _____ |

**COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AND EXPEDITED REVIEW PURSUANT TO 47 U.S.C. § 332(c)(7)(B)(v)**

Plaintiff, ExteNet Systems, Inc. ("Plaintiff" or "ExteNet"), by its undersigned attorneys, for its Complaint against the Town of Hull, Massachusetts and the Town of Hull Board of Selectmen ("Board", collectively, "Hull" the "Town" or "Defendants"), respectfully alleges as follows and hereby petitions this Court to conduct an expedited review of Defendants' denial of various applications submitted by ExteNet for access to the public rights-of-way, in violation of Federal law, conduct a review of the legality of the Town of Hull SWF Wireless Facilities and Similar Structures Policy, Rules and Regulations, and to grant injunctive and declaratory relief to ExteNet permitting access to the public rights-of-way.

## INTRODUCTION AND REGULATORY FRAMEWORK

1.      In 1996, Congress enacted the Telecommunications Act of 1996, No. 104-104, 110 Stat. 56 (1996), which amended the Communications Act of 1934, codified in 47 U.S.C. §151 et seq. (hereinafter, the "Act" or the "TCA") as a "pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans . . . ."[1]

2.      Congress has declared that there is a need for wireless communication services, including "personal wireless services," as set forth in the Act, and the rules, regulations and orders of the Federal Communications Commission ("FCC") promulgated pursuant thereto.  In order to foster its pro-competitive, deregulatory national policy, Congress included provisions in the Act that encourage competition by restricting the regulation of the placement of personal wireless service facilities by State and local governments and instrumentalities thereof.

3.      Section 332(c)(7) of the Act imposes substantive and procedural limitations on State and local governments and instrumentalities thereof to ensure that the Act's pro-competitive goals are not frustrated and it expressly preempts any action or inaction by State or local governments or their agents that effectively prohibits the provision of wireless services.

4.      Section 332(c)(7) of the Act strikes a balance between "preserv[ing] the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers" and "reduc[ing] . . .

---

[1] The Act, S. Rep. 104-230, at 1 (Feb. 1, 1996) (Conf. Report).

the impediments imposed by local governments upon the installation of facilities for wireless communications."[2]

5.     While Section 332(c)(7)(A) of the Act preserves "the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities," that authority is subject to significant limitations.

6.     Among the limitations placed on "State or local government(s) or instrumentalit(ies) thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities" are that,

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.[3]

7.     Further, Section 332(c)(7)(B)(ii) of the Act, requires States and local governments or instrumentalities thereof to "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly

---

[2] *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115; 125 S. Ct. 1453, 161 L.Ed.2d 316, (2005); *See also, T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293; 135 S. Ct. 808, 814; 190 L.Ed.2d 679 (2015);

[3] 47 U.S.C. § 332(c)(7)(B)(i).

filed with [the relevant] government or instrumentality, taking into account the nature and scope

of such request."[4]

8.     Section 332(c)(7)(B)(iv) specifically states that

> No State or local government or instrumentality thereof may
> regulate the placement, construction, and modification of personal
> wireless service facilities on the basis of the environmental effects
> of radio frequency emissions to the extent that such facilities
> comply with the Commission's regulations concerning such
> emissions.[5]

9.     The purpose of Section 332(c)(7)(B) of the Act is to counteract delays and

unreasonable conditions in consideration of wireless facility siting applications by State or local

governments or their agents, which thwart timely rollout and deployment of wireless service.

10.     Section 332(c)(7)(B)(v) of the Act provides that:

> any person adversely affected by any final action or failure to act
> by a State or local government or any instrumentality thereof that
> is inconsistent with this subparagraph may, within 30 days after
> such action or failure to act, commence an action in any court of
> competent jurisdiction. The court shall hear and decide such action
> on an expedited basis.

11.     As the federal agency tasked with implementing the Act, the FCC has the

authority to promulgate rules and regulations to achieve the purposes of the Act.

12.     In its *Third Report and Order*[6], the FCC specifically stated that:

---

[4] 47 U.S.C. § 332(c)(7)(B)(ii).

[5] 47 U.S.C. § 332(c)(7)(B)(iv).

[6] *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT 17-29, WC 17-84, FCC 18-133, Sept. 26, 2018. ("*Third Report and Order*"). The *Third Report and Order* became effective as of January 14, 2019. 83 Fed. Reg. 51,867 (2018).

a state or local legal requirement constitutes an effective prohibition if it "materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." Our interpretation of that standard, as set forth above, applies equally to fees and to non-fee legal requirements. [7]

13.     The FCC noted that among the purposes of the *Third Report and Order* was to:

- "clarify the particular standard that governs the fees and charges that violate Sections 253 and 332 [of the Act] when it comes to the Small Wireless Facilities at issue."[8];

- "address[] state and local consideration of aesthetic concerns in the deployment of Small Wireless Facilities, recognizing that certain reasonable aesthetic considerations do not run afoul of Sections 253 and 332."[9] and,

- "address[] the 'shot clocks' the "shot clocks" governing the review of wireless infrastructure deployments," and "create a new set of shot clocks tailored to support the deployment of Small Wireless Facilities."[10]

14.     In the *Third Report and Order, t*he FCC urged municipalities to adopt aesthetics standards, such as the Draft Policy within 180 days after the publication of the Third Report and Order in the Federal Register:

> We appreciate that at least some localities will require some time to establish and publish aesthetics standards that are consistent with this Declaratory Ruling. Based on our review and evaluation of commenters' concerns, we anticipate that such publication should take no longer than 180 days after publication of this decision in the Federal Register. [11]

---

[7] *Id*. at ¶ 35, *citing, Petition of California Payphone,* 12 FCC Rcd 14911, 14206, ¶ 31 (1997) ("California Payphone").

[8] *Third Report and Order* at ¶ 11.

[9] *Id*. at ¶ 12.

[10] *Id*. at ¶ 13.

[11] *Id*. at ¶ 89.

15.     The *Third Report and Order* was published in the Federal Register on *October* 15, 2018 and became effective on January 14, 2019.[12]

16.     April 13, 2019 was the 180th day after publication of the *Third Report and Order* in the Federal Register.

17.     The FCC specifically directed that

> to establish that [such policies] are reasonable and reasonably directed to avoiding aesthetic harms, aesthetic requirements must be objective—i.e., they must incorporate clearly-defined and ascertainable standards, applied in a principled manner—and must be published in advance. "Secret" rules that require applicants to guess at what types of deployments will pass aesthetic muster substantially increase providers' costs without providing any public benefit or addressing any public harm. Providers cannot design or implement rational plans for deploying Small Wireless Facilities if they cannot predict in advance what aesthetic requirements they will be obligated to satisfy to obtain permission to deploy a facility at any given site. [13]

18.     Federal Courts have confirmed that a state or local regulation that prohibit or have the effect of prohibiting the provision of telecommunications and/or personal wireless services are preempted.

19.     Sections 253(a) and 332(c)(7) of the TCA also require that any actions a locality takes, legislative or on a specific application, be made on a competitively neutral and non-discriminatory basis.

20.     Section 253(c) of the TCA limits municipal jurisdiction over public rights of way to "management" of their use for the provision of telecommunications services.

---

[12] 83 Fed. Reg. 51,867 (2018)

[13] *Third Report and Order* at ¶ 88.

21.     Section 332(c)(7) of the TCA requires that any decision by a local authority denying a request or application for a wireless facility be in writing and supported by substantial evidence.

22.     Section 332(c)(7)(B)(v) grants any entity adversely affected by an action or inaction of a municipality on an application for a wireless facility the right to commence an action, which the "court shall hear and decide…on an expedited basis."

23.     As discussed below, beginning in 2017 the Defendants rejected various ExteNet applications to construct three personal wireless service facilities in the Town's public rights-of-way based on ExteNet's inability to provide for speculative and irrelevant materials that the Board deemed necessary for its consideration in violation of Federal law and FCC rules and regulations.

24.     As discussed below, the Town's rejection of ExteNet's Applications and the Town's policies constitutes illegal and unreasonable discrimination among providers of functionally equivalent services.

25.     As discussed below, the Town's rejection of ExteNet's Applications and the Town's policies constitute an illegal prohibition or has the effect of prohibiting the provision of personal wireless services.

**JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction over this action pursuant to: (a) 47 U.S.C. §§ 253 and 332(c)(7)(B) of the Act because ExteNet has been adversely affected and aggrieved by Defendants' actions in violation of those provisions of the Act; and (b) 28 U.S.C. § 1331 because this is a civil action that presents federal questions arising under the Act.

7

27.     This Court has jurisdiction to order declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction with regard to any state law claims pursuant to 28 U S.C. § 1367.

28.     This Court has personal jurisdiction over the Defendants, and venue is proper in this Court, as the Defendants conduct or have conducted continuous, systematic, and routine business within the County of Plymouth in the Commonwealth of Massachusetts and within the jurisdiction of this Court, pursuant to 28 U.S.C. § 101.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this action occurred in the District of Massachusetts.

## EXPEDITED PROCEEDING

30.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(v) of the Act, this Court "shall hear and decide [this] action on an expedited basis."

## THE PARTIES

31.     ExteNet is a Delaware corporation and maintains its principal place of business at 3030 Warrenville Road, Suite 340, Lisle, Illinois 60532-3633, in the County of DuPage, Illinois.

32.     ExteNet provides wholesale, facilities-based telecommunications services and holds certificates to provide such services in 45 states and the District of Columbia.

33.     ExteNet, through its predecessor in interest, ClearLinx Network Corporation, is registered with the Massachusetts Department of Telecommunications and Cable to provide intrastate telecommunications services in Massachusetts.

34.     ExteNet builds, owns, and operates wholesale, neutral-host distributed network facilities that improve the coverage and capacity of existing and new wireless networks.

35.     ExteNet's distributed network facilities consist of: (a) fiber optic cable; and (b) small antennas and supporting equipment that are either attached to utility poles and other structures in the public rights-of-way or suspended on cables strung between utility poles or wireless support structures.

36.     ExteNet's distributed network facilities meet the definition of Small Wireless Facilities, as defined at 47 C.F.R. § 1.6002(l).

37.     Wireless service providers — such as Verizon Wireless, AT&T, Sprint, and T-Mobile — pay ExteNet to use its distributed network facilities to assist them in providing wireless telecommunications services to retail consumers.

38.     Defendant, Town of Hull, Massachusetts is a municipal corporation duly organized under the laws of the State of Massachusetts with a principal place of business at 253 Atlantic Ave., Hull, Massachusetts 02045, in the County of Plymouth.

39.     Defendant, the Town of Hull Board of Selectmen, is an agency of Defendant Town of Hull, Massachusetts pursuant to Massachusetts law and maintains its principal place of business at 253 Atlantic Ave., Hull, Massachusetts 02045, in the County of Plymouth.

40.     Defendants Domenic Sestito, Jennifer Berardi-Constable, Greg Grey, John D. Reilly and Kevin Richardson are members of the Town of Hull Board of Selectmen, with a principal place of business at 253 Atlantic Ave., Hull, Massachusetts 02045, in the County of Plymouth, and are sued solely in their capacity as members of the Board of Selectmen and not individually.

## FACTS COMMON TO ALL COUNTS

41.    For over three years, ExteNet has been working with the Town of Hull to build three small wireless facility sites in the public rights-of-way located under the jurisdiction of the Town.

42.    The instant Complaint involves the Town's denial of ExteNet's fourth attempt to gain the approvals sought for these three Small Wireless Facilities.

43.    The three Small Wireless Facilities for which ExteNet seeks authorization are located at (collectively, the "Sites"):

- ExteNet Node 10, Pole No. 10, located at:
  Beach Avenue and "R" Street
  42.301722° N, 70.882015°W;

- ExteNet Node 11, Pole No. 28, located at:
  Beach Avenue and Warren Street
  42.286909° N, 70.872317°W; and,

- ExteNet Node 12, Pole No. 56, located at:
  Beach Avenue and "B" Street
  42.293409° N, 70.876638°W.

44.    Each of the Sites are proposed to be constructed on replacements for existing utility poles owned by the Town of Hull Municipal Light Plant ("MLP").

45.    Through successors and subsidiaries, ExteNet has a valid Pole Attachment Agreement with the MLP, dated April 22, 2005, for the placement of cables, equipment, and facilities by ExteNet on MLP's poles and a valid Agreement regarding dark fiber and right of way licenses with MLP, dated March 31, 2005.

46.    The two Agreements between ExteNet and MLP were initially made between MLP and Green Mountain Wireless, Inc.

47.     In 2005, Green Mountain Wireless, Inc. merged into Spectrasite Outdoor DAS Networks, Inc.

48.     In January 2006, with the consent of MLP, Spectrasite Outdoor DAS Networks, Inc. assigned the agreements to National Grid Communications, Inc.

49.     In 2007, National Grid Communications changed its name to Light Tower Wireless, LLC.

50.     In 2008, Light Tower Wireless, LLC changed its name to SBA Advanced Wireless Networks, LLC.

51.     In 2010, ExteNet purchased SBA Advanced Wireless Networks, LLC and changed its name to ESI Advanced Wireless Networks, LLC.

52.     In 2019, ESI Advanced Wireless Networks, LLC was dissolved into its parent company, ExteNet Systems, Inc.

53.     ExteNet has repeatedly communicated to the Town that any construction and the installation of the Sites will be according to the guidelines, engineering specifications, and contractual obligations contained in ExteNet's Agreements with MLP.

54.     On June 5, 2019, ExteNet applied for authority to construct the Sites.

55.     As the "shot clock" date, pursuant to 47 C.F.R. 1.6003, approached ExteNet offered and the Town accepted a tolling agreement that extended the "shot clock" to September 5, 2019.

56.     On August 22, 2019, the Town held a Public Hearing to consider ExteNet's Application.

57.     At the August 22, 2019 Public Hearing, the Board voted to deny ExteNet's Application.

58.     On September 5, 2019, the Board issued a written denial of ExteNet's Application.[14]

59.     Among the reasons stated for denial of ExteNet's Application were:

    a.  Alleged issues the Board's Expert Witness had with ExteNet's Radio Frequency Emissions Reports;

    b.  Alleged issues with the noise emissions of fans located in the equipment at the sites; and,

    c.  The Board wanted to see how service would be "materially inhibited" without approval of these sites.

60.     Though Federal Law would have allowed ExteNet to take a direct appeal of the *September 5 Denial* to this Court,[15] ExteNet choose not to do so at that time.

61.     Rather than appeal the *September 5 Denial* to Federal Court, ExteNet chose to resubmit its Application to the Board specifically addressing the issues the Town identified in its September 5 Denial.

62.     On September 23, 2019, ExteNet proffered the instant Application to the Town for permits to allow for the construction of three (3) personal wireless service facility nodes on replacement MLP owned utility poles in the public rights-of-way located in the Town.

63.     Specifically, the Application was for the following personal wireless service facility sites:

---

[14] Town of Hull, *Report and Decision of the Licensing Authority*, In Re: ExteNet Petition of June 4, 2019, issued, September 5, 2019 ("*September 5 Denial*").

[15] 47 C.F.R. §332(c)(7)(b)(v).

- ExteNet Node 10, Pole No. 10, located at:
  Beach Avenue and "R" Street
  42.301722° N, 70.882015°W;

- ExteNet Node 11, Pole No. 28, located at:
  Beach Avenue and Warren Street
  42.286909° N, 70.872317°W; and,

- ExteNet Node 12, Pole No. 56, located at:
  Beach Avenue and "B" Street
  42.293409° N, 70.876638°W.

64.     ExteNet is under contract with Verizon (the "Customer") to build the small cell wireless facilities listed above for the Customer.

65.     ExteNet will own the facilities and lease them to the Customer for provision of wireless services, including without limitation, personal wireless services from the sites.

66.     The Customer was not a party to ExteNet's Applications to the Board and is not a necessary party to this proceeding.

67.     According to the FCC's *Third Report and Order*, the proffering by ExteNet of the Application to the Board, started the formal application process and the "FCC Shot Clock" on each of the Applications.

68.     Each of the Applications is for installation of personal wireless service facilities on a replacement utility pole, which under the Shot Clock Order, constitute "collocation."[16]

69.     The FCC has specifically stated that "[c]onsidering this evidence as a whole, a review period . . .  gives State and local governments sufficient time for reviewing applications

---

[16] 47 C.F.R. § 1.6002(g).

for completeness, while protecting applicants from a last minute decision that applications should be denied as incomplete."[17]

70.     In the *Third Report and Order,* the FCC established a ten (10) day review period for Small Wireless Facility Applications.

> For Small Wireless Facilities applications, the siting authority has 10 days from the submission of the application to determine whether the application is incomplete. The shot clock then resets once the applicant submits the supplemental information requested by the siting authority. Thus, for example, for an application to collocate Small Wireless Facilities, once the applicant submits the supplemental information in response to a siting authority's timely request, the shot clock resets, effectively giving the siting authority an additional 60 days to act on the Small Wireless Facilities collocation application.[18]

71.     The FCC Codified this condition at 47 C.F.R. 1.6003(d)(1):

> For an initial application to deploy Small Wireless Facilities, if the siting authority notifies the applicant on or before the 10th day after submission that the application is materially incomplete, and clearly and specifically identifies the missing documents or information and the specific rule or regulation creating the obligation to submit such documents or information, the shot clock date calculation shall restart at zero on the date on which the applicant submits all the documents and information identified by the siting authority to render the application complete.

72.     Pursuant to 47 C.F.R. 1.6003(d)(1), the Defendants had 10 days in which to identify any deficiencies in the Applications and to notify ExteNet of such deficiencies.

---

[17] *In Re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, WT 08-165, FCC 09-99, ¶ 53 (Nov 18, 2009) ("*2009 Declaratory Ruling*"), *aff'd, City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013).

[18] *Third Report and Order,* ¶143.

73.     On October 3, 2019, the 10th day, the Board sent ExteNet an "Application Completeness Review; ExteNet Application Submitted September 23, 2019 for Grant of Location, Hull, Massachusetts" ("*Completeness Review*").

74.     The timely receipt of the *Completeness Review* meant that the 60 day shot-clock would not start until ExteNet responded to the *Completeness Review*.

75.     In the *Completeness Review*, the Board notified ExteNet, for the first time, that "[o]n September 9, 2019, the Board adopted regulations concerning applications for Small Wireless Facilities in the public rights of way, titled Town of Hull SWF Wireless Facilities and Similar Structures – Policies, Rules and Regulations ("Policy").

76.     The September 9, 2019 Board Meeting at which the Policy was adopted was allegedly noticed on September 5, 2019.

77.     Based on information and belief, ExteNet, which already has 9 preexisting Small Wireless Facilities in the Town, is an interested party to any such *Policy*.

78.     ExteNet, an interested party, was never given any notice of the September 9, 2019 Board Meeting.

79.     The September 9, 2019 Board Meeting, though noticed prior to the Board's Regulatory Scheduled September 5, 2019 Board meeting, was never publicly mentioned by any member of the board at the September 5, 2019 Board meeting.

80.     The September 9, 2019 Board Meeting and the, then proposed, Policy were not referenced in the Board's *September 5 Denial*.

81.     The September 9, 2019 Board Meeting was, based on information and belief, never specifically noticed to any wireless industry representatives.

82.     Though most Board Meetings are televised, the September 9, 2019 Board Meeting was not televised on the HullTV Website.

83.     Based on information and belief, the September 9, 2019 Board Meeting was not videotaped.

84.     The Policy was posted to the Town's website until September 30, 2019, a week after ExteNet filed its Application.

85.     On October 8, 2019, ExteNet sent a Request for Public Documents to the Town regarding the September 9, 2019 Meeting.

86.     Pursuant to M.G.L. c. 66, § 10, the Town had 10 business days following the receipt of ExteNet's request to provide or permit inspection of the requested records.

87.     To date, the Town has failed to provide any of the documents requested by ExteNet on October 8, 2019.

88.     In the *Third Report and Order,* the FCC urged municipalities to adopt aesthetics standards, such as the Town's *Policy* within 180 days after the publication of the *Third Report and Order* in the Federal Register.[19]

89.     The *Third Report and Order* was published in the Federal Register on *October* 15, 2018 and became effective on January 14, 2019.[20]

90.     April 13, 2019 was the 180th day after publication of the *Third Report and Order* in the Federal Register.

---

[19] *Third Report and Order* at ¶ 89.

[20] 83 Fed. Reg. 51,867 (2018)

91.     The FCC specifically directed that policies such as the Defendants' Policy Regarding Small Cell Wireless Installations on Public Ways should be,

> reasonable and reasonably directed to avoiding aesthetic harms, aesthetic requirements must be objective—i.e., they must incorporate clearly-defined and ascertainable standards, applied in a principled manner—and must be published in advance. "Secret" rules that require applicants to guess at what types of deployments will pass aesthetic muster substantially increase providers' costs without providing any public benefit or addressing any public harm. Providers cannot design or implement rational plans for deploying Small Wireless Facilities if they cannot predict in advance what aesthetic requirements they will be obligated to satisfy to obtain permission to deploy a facility at any given site. [21]

92.     The Defendants' Policy does not "incorporate clearly-defined and ascertainable standards, applied in a principled manner."

93.     The Defendant's Policy goes beyond aesthetic standards and attempts to unlawfully influence the engineering of an Applicant's network.

94.     On November 26, 2019, ExteNet filed a Supplemental Application of ExteNet Systems, Inc. for Access to the Rights-of-Way in Hull, Massachusetts ("*Supplemental Application*").

95.     The *Supplemental Application* addressed the alleged deficiencies identified in the *Completeness Review.*

96.     In the *Supplemental Application,* ExteNet provided additional requested information.

97.      In the *Supplemental Application,* ExteNet provided legal challenges to various parts of the *Policy* that ExteNet believes are unlawful and overreaching.

---

[21] *Third Report and Order* at ¶ 88.

98.     The submission of the *Supplemental Application*, restarted the shot-clock.[22]

99.     The Defendants had 60-days from the submission of the Supplemental Application to issue a determination on ExteNet's Application.[23]

100.    The 60-day shot clock would have expired on January 27, 2020.

101.    On or about January 22, 2020, the Town notified ExteNet that a Public Hearing would be held on January 27, 2020 on the Application.

102.    A Public Hearing was held on January 27, 2020 to consider ExteNet's Application.

103.    At the January 27, 2020 Public Hearing, the Application was denied on the following grounds:

> 1) ExteNet has chosen not to provide information on the "maximum number of transmitters the system is designed to be expandable to" on each of the three proposed new nodes, or information on the maximum output power of the maximum number of transmitters, or a Radio Frequency Energy Emissions analysis showing that each proposed node, "with the designed expansion capability, will be compliant with applicable federal and state requirements with respect to human exposure to RFE." As a result of its decision not to provide this information, ExteNet has failed to meet the requirements of the Hull SWF Policies, Section 6(c)(vi)(2),(3).
>
> 2) ExteNet has chosen not to present any information on how the proposed nodes will affect any wireless provider's service in Hull, and has thus failed to establish that without the new nodes any wireless provider's service will be "effectively prohibited." As a result of its decision not to provide this information, ExteNet has failed to meet the requirements of the Hull SWF Policies, Section 6(o).

---

[22] 47 C.F.R. § 1.6003(d)(1).

[23] 47 C.F.R. § 1.6003(c)(1)(i).

3) ExteNet has chosen not to provide an engineer's certification that the new poles ExteNet proposes for each of the proposed nodes "will safely support the proposed equipment." As a result of its decision not to provide this information, ExteNet has failed to meet the requirements of the Hull SWF Policies, Section 6(f).

104.    Despite the appearance of a fair hearing, the written denial had been prepared prior to the hearing and was handed to ExteNet at the conclusion of the hearing.  A copy of the written motion for denial is attached hereto as **Exhibit A**.

105.    The first claim of denial, that,

ExteNet has chosen not to provide information on the "maximum number of transmitters the system is designed to be expandable to" on each of the three proposed new nodes, or information on the maximum output power of the maximum number of transmitters, or a Radio Frequency Energy Emissions analysis showing that each proposed node, "with the designed expansion capability, will be compliant with applicable federal and state requirements with respect to human exposure to RFE."

would require ExteNet to engage in speculation and provide information and data that based on conjecture.

106.    The first claim of denial exceeds the Board's authority and is preempted by Federal Law.

107.    In its Application, ExteNet provided an RF Study and specifically noted that "[t]he proposed Small Wireless Facilities do not result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in §1.1307(b)."

108.    In its Supplemental Application, ExteNet noted that:

The Town is prohibited from speculating on why ExteNet chooses certain equipment or specifications as long as such equipment complies with the Town's aesthetic standards.  As noted in the Federal Communications Commission's ("FCC") *Third Report and Order*:

> Because local jurisdictions do not have the authority to regulate these interstate services, there is no basis for local jurisdictions to conduct proceedings on the types of personal wireless services offered over particular wireless service facilities or the licensee's service area, which are matters within the Commission's licensing authority. Furthermore, local jurisdictions do not have the authority to require that providers offer certain types or levels of service, or to dictate the design of a provider's network. See 47 U.S.C. § 332(c)(3)(A); *see also Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000).[24]

109.    Federal Law further provides:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.[25]

110.    ExteNet's RF Study demonstrated that each of the Small Wireless Facilities as designed and proposed complies with the FCC's regulations concerning radio frequency emissions.  This is the extent of the inquiry the Board is permitted to make under the Act.

111.    The Board's insistence that ExteNet provide compliance calculations for equipment not proposed as part of ExteNet's proposed Small Wireless Facilities, and that may never be proposed or installed, is preempted by the Act.

112.    The second claim of denial is based on a now obsolete "gap in coverage" test that was previously applied to macro wireless towers and not to Small Wireless Facilities.

113.    In the *Third Report and Order*, the FCC specifically stated that:

---

[24] *Third Report and Order* at ¶36, n. 84.

[25] 47 U.S.C. § 332(c)(7)(B)(iv).

a state or local legal requirement constitutes an effective prohibition if it "materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." Our interpretation of that standard, as set forth above, applies equally to fees and to non-fee legal requirements. [26]

114.    The effective prohibition test now applies not only when a provider is attempting to fill a gap in coverage, but also when the provider proposes to densify its existing wireless network, introduce new services, or otherwise improve service capabilities.

115.    Effectively, all right-of-way regulations and determinations as applied to installation of Small Wireless Facilities are now be scrutinized under the new effective prohibition test enunciated in the *Third Report and Order*.

116.    Under the new effective prohibition test, as long as a provider asserts any factor under the test, the test is met.

117.    In establishing such, the FCC further relied on its own ruling in *California Payphone*:

> Under the California Payphone standard, a state or local legal requirement could materially inhibit service in numerous ways—not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services. Thus, an effective prohibition includes materially inhibiting additional services or improving existing services.

---

[26] *Third Report and Order* at ¶ 35, *citing, Petition of California Payphone,* 12 FCC Rcd 14911, 14206, ¶ 31 (1997) ("*California Payphone*").

118.    The FCC in its August 2, 2018 *Moratoria and One-Touch Make Ready Declaratory Ruling*,[27] interpreted

> "service" to mean any covered service a provider wishes to provide, incorporating the abilities and performance characteristics it wishes to employ, including to provide existing services more robustly, or at a higher level of quality—such as through filling a coverage gap, densification, or otherwise improving service capabilities.  Thus, a prohibition or effective prohibition could occur not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider, but also by prohibiting or effectively prohibiting the introduction of new services or significant improvements to existing services by an incumbent provider. In this regard, we believe it is appropriate to construe section 253(a) in light of the broader goals outlined by Congress: "to make available . . .a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . ." 47 U.S.C. § 151.[28]

119.    Thus, the new effective prohibition test merely requires ExteNet to assert that the service it seeks to provide through the proposed Small Wireless Facilities will result in additional services or improvement of existing services in the area.  The Application, by its very nature consists of such an assertion.

120.    The third claim of denial asserts that ExteNet has failed to provide proof that the replacement poles that ExteNet is proposing to install "will safely support the proposed equipment."

---

[27] *In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT 17-84, WC 17-79, FCC 18-111, Aug.2, 2018. ("*Moratoria and One-Touch Make Ready Declaratory Ruling*").

[28] *Id.* at ¶ 162, fn. 594, see also, *Third Report and Order* at ¶ 37, fn. 87.

121.    As repeatedly communicated to the Town, ExteNet will be replacing poles in conjunction with the pole owners, MLP.

122.    MLP is responsible for certifying such as the local public utility – not the Town.

123.    Pursuant to 47 U.S.C. § 332(c)(7)(B)(v), this Action is timely filed within thirty (30) days of the Defendants' January 27, 2020 written denials of ExteNet's Applications.

<u>**COUNT I**</u>
**(Violations of 47 U.S.C. § 253 – Facial Preemption)**

124.    ExteNet repeats and realleges all prior allegations as if set forth herein.

125.    47 U.S.C. § 253(a) provides that "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

126.    47 U.S.C. § 253(c) requires municipalities to manage their public rights of way "on a competitively neutral and non-discriminatory basis…"

127.    ExteNet has been attempting to exercise its right to access public rights-of-way located within the Town to provide telecommunications services for over four years.

128.    On its face, the Policy is preempted because it discriminates against and effectively prohibits companies that are seeking access to public rights-of-way in Hull for deployment of small cells by applying legal requirements that materially impact and place higher procedural and substantive burdens on such providers of wireless services in comparison to other providers of telecommunications services, which are subject to less burdensome procedural and/or substantive requirements.

129.    On its face, the Policy is preempted because it requires speculative conjecture in an Application.

23

130.     To the extent the Policy is not preempted in its entirety, multiple provisions of the Policy are preempted as effectively prohibiting and discriminating against companies seeking to deploy small cells in the public right-of-way, including the requirements that Applicants provide speculative information and conjecture.

131.     To the extent the Policy is not preempted in its entirety, multiple provisions of the Policy are preempted as effectively prohibiting and discriminating against companies seeking to deploy small cells in the public right-of-way, including the requirements that Applicants provide information preempted by Federal law.

132.     To the extent the Policy is not preempted in its entirety, multiple provisions of the Policy are preempted as effectively prohibiting and discriminating against companies seeking to deploy small cells in the public right-of-way, including the requirements that Applicants provide "a rationale for each proposed location and for the overall combination of locations, demonstrating how the number of facilities has been minimized, the impacts of the facilities have been minimized, the sharing of existing locations is, should not or cannot be accomplished to minimize the deployment of SWFs on additional poles."

133.     To the extent the Policy is not preempted in its entirety, multiple provisions of the Policy are preempted as effectively prohibiting and discriminating against companies seeking to deploy small cells in the public right-of-way, including the requirements that Applicants provide information and certification that are outside the jurisdiction of the Town.

## COUNT II
### (Violations of 47 U.S.C. § 253 – As Applied Preemption)

134.     ExteNet repeats and realleges all prior allegations as if set forth herein.

135.     In prohibiting ExteNet from accessing the right of way to deploy its infrastructure and provide telecommunications services over the last four years, the Town has effectively prohibited ExteNet from providing additional telecommunications services in Hull.

136.     Specifically in repeatedly densifying ExteNet's Applications and then instituting a policy that changed the ground rules for such, without sufficient notice to ExteNet, requiring ExteNet to re-submit information it had provided many times over, then denying ExteNet's Application for, among other reasons failing to provide speculative information the Town's actions have the effect of prohibiting the provision of telecommunications services.

137.     Additionally, in citing ExteNet's purported failure to demonstrate information regarding speculative additions to the proposed installation, and any gap in coverage, the Town exceed its limited authority of management of the right of way and effectively regulated the provision of telecommunications services.

138.     ExteNet has suffered and will continue to suffer irreparable harm because of the Town prohibiting ExteNet from providing additional telecommunications services.

<div align="center">

**COUNT III**
**(Violations of 47 U.S.C. § 332(c)(7))**

</div>

139.     ExteNet repeats and realleges all prior allegations as if set forth herein.

140.     Section 332(c)(7) of the Act provides that the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not discriminate among providers of functionally equivalent services…and shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

141.    Section 332(c)(7) further provides that any "decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

142.    Section 332(c)(7) further provides that "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

143.    Section 332(c)(7)(B)(v) requires that a court hear and decide an action brought by a party adversely affected by a final action or inaction by a municipality on an expedited basis.

144.    As applied by the Town Board, the *Policy* has the effect of prohibiting the provision of wireless services, as the Town's application of that law materially inhibited ExteNet's ability to install small cells throughout Hull.

145.    By using prospective and hypothetical standards as a basis to deny ExteNet's Application, the Town effectively prohibited the provision of wireless services.

146.    By citing ExteNet's failure analyze any gap in coverage as a basis to deny ExteNet's Application, the Town effectively prohibited the provision of wireless services.

147.    By requiring ExteNet to demonstrate that a denial of its Application would result in an effective prohibition, the Board applied a standard not found in applicable state law and therefore its decision is not based on substantial evidence.

148.    The reasons contained in the Town's findings supporting its denial of ExteNet's special permit application are not based on substantial evidence and are, in fact, contradicted by the record evidence and the law.

149.    Upon information and belief, the Town improperly considered generalized community opposition and the health effects from RF exposure in denying ExteNet's application in violation of the Act.

**COUNT IV**
**(For Declaratory Relief and Permanent Injunction)**

150.    ExteNet repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated here.

151.    A present and actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties.  ExteNet contends that the Defendants' actions and omissions are in violation of the Act, 47 C.F.R. § 1.6003 and various FCC Orders.

152.    ExteNet and the public have been and will continue to be adversely affected by the Defendants' actions and omissions.

153.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of ExteNet's rights and the Defendants' obligations and authority.

154.    As a result of Defendants' actions and omissions, ExteNet has been, and will continue to be, damaged and irreparably harmed absent the relief requested herein.

155.    The harm caused by the Defendants' actions and omissions includes, but is not limited to, an effective prohibition on ExteNet's ability to provide personal wireless services at the Sites, and unreasonable delay in taking final (and any) action on the Applications, all impairing ExteNet's (a) ability to provide the public with reliable wireless telecommunications

service; (b) ability to compete with other providers of telecommunications services; (c) full use of its existing FCC and Massachusetts telecommunications authorizations, and or licenses and business investments; and (d) good will and business reputation.

156.    ExteNet has a likelihood of success on the merits because it is entitled to access public rights-of-way under Federal law and there is no reasonable justification for Defendants' failure to act on ExteNet's Applications to install personal wireless service facilities on, or suspended adjacent to, existing utility poles in the public rights-of-way.

157.    The harm that ExteNet has suffered and continues to suffer from the Defendants' actions and omissions is not reasonably susceptible to accurate calculations and cannot be fully and adequately addressed through an award of damages.

158.    Given that the matter in dispute is Defendants' failure to issue permits and authorize ExteNet to install personal wireless service facilities on, or suspended adjacent to, existing utility poles in the public rights-of-way, ExteNet cannot be made completely whole by damages and has no other adequate remedy at law other than the Court ordering that the Applications be deemed granted or by the Court compelling Defendants to grant ExteNet's Applications.

159.    A balancing of the equities tips in ExteNet's favor in that it has proceeded throughout the application process in good faith and has submitted all requested forms and documents, while Defendants "should be presumed to have acted unreasonably."[29]

160.    Defendants have failed to act as required by Federal law.

---

[29] *Id.*

161.    In contrast to the immediate and irreparable injury being suffered by ExteNet, its customers, and the public interest, the Defendants will suffer no significant injury if the Court issues the requested injunction.

162.    As such, ExteNet is entitled to a judgment and order of permanent injunction compelling Defendants to issue permits and any other approvals required to allow ExteNet to install the personal wireless service facilities on, or suspended adjacent to, existing utility poles in the public rights-of-way that are the subject of this Action.

### PRAYER FOR RELIEF

**WHEREFORE**, ExteNet respectfully requests that, pursuant to 47 U.S.C. 253(a) and 47 U.S.C. § 322(c)(7)(B)(v), the Court hear and decide this action on an expedited basis, and issue an Order and Judgment in its favor as follows:

a)    On the First Claim for Relief, an order and judgment declaring the Town's Policy is preempted in whole or in part, granting ExteNet's Application and mandating that the Town issue all necessary permits and authorizations for ExteNet to immediately deploy its infrastructure in the public right of way.

b)    On the Second Claim for Relief, an order and judgment declaring Town's Policy is preempted as applied, granting ExteNet's Application and mandating that the Town issue all necessary permits and authorizations for ExteNet to immediately deploy its infrastructure in the public right of way.

c)    On the Third Claim for Relief, an order and judgment granting ExteNet's Application and mandating that the Town issue all necessary permits and authorizations for ExteNet to immediately deploy its infrastructure in the public

right of way.

d)      On the Fourth Claim for Relief, an order and judgment granting ExteNet's Application and mandating that the Town issue all necessary permits and authorizations for ExteNet to immediately deploy its infrastructure in the public right of way.

e)      Awarding ExteNet its damages, reasonable attorneys' fees, costs, disbursements, and other expenses of this action as permitted by law; and

f)      granting such other and further relief as the Court deems just and proper.

<div style="margin-left:50%">

Respectfully submitted,
EXTENET SYSTEMS, INC.
By its attorneys,

*/s/ Brian S. Grossman*
Brian S. Grossman (BBO #641159)
Bowditch & Dewey LLP
200 Crossing Boulevard, Suite 300
Framingham, MA 01702
(508) 416-2410
bgrossman@bowditch.com

</div>

February 26, 2020

# EXHIBIT A

MOTION TO DENY EXTENET APPLICATION JANUARY 27, 2020

I hereby move that Extenet's Application for a Grant of Location, dated September 26, 2019 as supplemented on November 27, 2019, be denied for each of the following independently sufficient reasons:

1) Extenet has chosen not to provide information on the "maximum number of transmitters the system is designed to be expandable to" on each of the three proposed new nodes, or information on the maximum output power of the maximum number of transmitters, or a Radio Frequency Energy Emissions analysis showing that each proposed node, "with the designed expansion capability, will be compliant with applicable federal and state requirements with respect to human exposure to RFE." As a result of its decision not to provide this information, Extenet has failed to meet the requirements of the Hull SWF Policies, Section 6(c)(vi)(2),(3).

2) Extenet has chosen not to present any information on how the proposed nodes will affect any wireless provider's service in Hull, and has thus failed to establish that without the new nodes any wireless provider's service will be "effectively prohibited." As a result of its decision not to provide this information, Extenet has failed to meet the requirements of the Hull SWF Policies, Section 6(o).

3) Extenet has chosen not to provide an engineer's certification that the new poles Extenet proposes for each of the proposed nodes "will safely support the proposed equipment." As a result of its decision not to provide this information, Extenet has failed to meet the requirements of the Hull SWF Policies, Section 6(f).

M hy JR
2nd JC
VA Vite